BROWN LUMBER CO. *v.* CONSOLIDATED LUMBER CO.

1. REFORMATION OF INSTRUMENTS—CONTRACTS—TIMBER—LOGS AND LOGGING—FRAUD—MISTAKE—BURDEN OF PROOF.
    In suit to reform contract for purchase of standing timber on ground of fraud or mistake in estimating amount thereof, burden of proof is on plaintiffs.

2. SAME.
    Reformation of contract for purchase of standing timber was properly denied where burden of proving fraud or mistake in estimating amount of timber was not met by plaintiffs.

Appeal from Schoolcraft; Runnels (Herbert W.), J. Submitted June 12, 1931. (Docket No. 50, Calendar No. 35,609.) Decided October 5, 1931.

Bill by Brown Lumber Company, a Michigan corporation, and another against Consolidated Lumber Company, a Michigan corporation, and others to reform a contract for the purchase of timber and can-

cellation of notes given therefor. Cross-bill by Stearns Coal & Lumber Company, a Michigan corporation, purchaser of said notes, against plaintiffs for a money decree. From decree for cross-plaintiff, plaintiffs appeal. Affirmed.

*J. Joseph Herbert* (*Eldred & Gemuend,* of counsel), for plaintiffs.

*Virgil I. Hixson* (*Edward E. Barthell, Jr.,* of counsel), for defendants.

SHARPE, J. The Brown Lumber Company, a Michigan corporation, had been engaged in the lumber and woodworking business in Traverse City since about the year 1908. W. W. Parr was for many years its president and manager. The plaintiff Thad B. Preston is a resident of Ionia and a large stockholder in the company. The defendant Consolidated Lumber Company, a Michigan corporation, was organized in 1912. It acquired certain timber lands in the county of Schoolcraft, erected a sawmill thereon, and engaged in the manufacture of lumber. The defendant Culver, a resident of Ludington, was president of this company from 1915 until July 23, 1925.

In 1916, as a result of negotiations between Mr. Culver and Mr. Parr, the plaintiff company leased certain land from the Consolidated company, and erected thereon a woodworking plant, the lumber for which was to be supplied by the Consolidated company. In 1919, this company decided to discontinue the operation of its sawmill, and a written agreement was entered into on February 26, 1920, between the two companies, whereby the Consolidated company sold to the plaintiff company the

merchantable timber on certain of its lands, with some reservations, at the price of $6.50 per thousand feet of stumpage. The amount of the timber was to be determined by two cruisers, one selected by each of the companies, and, if they could not agree, a third cruiser should be named by the parties and the amount fixed by any two of them should be final. They were to include in their estimate all hardwood with tops not less than eight inches in diameter. and all softwood with tops not less than six inches in diameter.

It was further provided therein that upon its execution the plaintiff company should deliver to the Consolidated company its notes for $25,000, payable $5,000 on or before the 10th day of January, 1921, and $5,000 payable on the 10th day of each month thereafter until the purchase price, as determined by the estimate of stumpage, should be fully paid. It was further agreed that, after the amount of the timber had been determined, the plaintiff company, on June 1, 1920, should execute and deliver to the Consolidated company its promissory notes as above provided for. The lands included therein were in townships 44, 45, and 46 north, range 18 west.

Pursuant thereto, the plaintiff employed Joseph Chenord, and the defendant T. C. Sheridan, as cruisers. They completed their work in town 44 in the spring of 1920, estimating the merchantable timber thereon to be 15,868,000 feet. The plaintiff company thereupon sent William Richmond, a man selected by it, "to take charge of the woods work," with instruction "to check up on some of the descriptions" in town 44 and "see what he thought of that estimate," and "to block out the work that should be carried on during that season in taking it off." He reported that the amount of the timber as

estimated was not on the land. Mr. Parr thereupon advised the defendant Consolidated company that it would not accept this estimate. Plaintiff company thereupon substituted Richmond for Chenord to act with Sheridan in cruising the lands in towns 45 and 46. They completed their estimate on the timber in these towns, agreeing upon 19,041,000 feet. A new written agreement was entered into on June 1, 1920, as to this timber, in which the above estimate was accepted as final and provision made for the payment of $25,000 in cash and notes payable monthly. The cash payment was made, and these notes were executed by the plaintiff company and delivered to the Consolidated company.

After some negotiations, another cruise was made of the lands in town 44 by George Tuttle, representing the plaintiff company, and James Scott the Consolidated company, who agreed upon the amount of timber on this tract to be 5,877,000 feet. This the Consolidated company accepted; its acceptance being due, at least somewhat, as claimed by it, to the marked slump in the price of stumpage at that time. A settlement was had, based thereon, and this timber was fully paid for.

In 1922, the plaintiff company desired to issue bonds upon its holdings to refund some of its obligations. To do so it became necessary for it to acquire legal title to the timber theretofore held by it under the written agreements or contracts for its sale. A conveyance thereof was made to it by the Consolidated company, and, as a condition thereof, plaintiff company paid to it $60,000 in cash to apply on the purchase and executed notes for the balance. Prior to this bond issue, some investigation of the amount of the timber and the value of the plaintiff company's plants was made by an appraiser of the

bonding company. The circulars issued relating thereto stated that the issue of $150,000 was "secured by a closed first mortgage on approximately 24,000,000 feet of timber."

In the month of February, 1925, the plaintiff company sent its then woods superintendent, George Tuttle, to block out a lumbering operation of the timber in towns 45 and 46. He soon thereafter reported that there was an error in the estimate; that the amount as determined by the cruisers was not on the lands. A few weeks thereafter there was discussion of the matter and some correspondence between Mr. Parr and Mr. Culver, but no agreement was reached relative thereto. The plaintiff company cut a part of the timber on these tracts (3,162,077 feet), and afterwards had a cruise thereof made by Banzhaf & Watson, Inc., which revealed, with that cut, a total thereon of 6,817,177 feet.

In the meantime, the financial affairs of the Consolidated company had not been prosperous. The defendant Stearns Coal & Lumber Company became interested therein, and both Mr. Stearns and Mr. Culver became personally liable for considerable sums in an effort to keep it afloat. Its liabilities became such that a public sale of the great bulk of its assets was had on January 26, 1926, at which the Stearns company became the purchaser for $250,000. Later, notes of the plaintiff company to the amount of $40,000, being the balance due on the sale made on June 1st, which had been used as collateral with a banking firm in Milwaukee, were sold and were purchased by the defendant Stearns company. These notes were indorsed by the plaintiff Preston.

On September 2, 1926, the plaintiffs filed the bill of complaint herein. It was twice amended, the last

time on November 5, 1927. It set up with more particularity the facts above stated. It prayed for a reformation of the contract of sale to make the finality of the cruisers' determination of the amount of the timber on the lands in towns 45 and 46—

"to be dependent upon an accurate and correctly made cruise and estimate of the said timber honestly made; and that the same may be decreed to be subject to such modification as shall apply to mutual mistake and fraud, and that the said clause be so modified and to apply to and mean the actual amount of timber, of the specifications described in said contracts found to be on said lands;"—

for a decree that the notes held by the Stearns company were null and void, and for an accounting of the money due by it on account of its purchase, and a personal decree against the Consolidated company and Culver for the amount overpaid by it on account thereof. The answers of the defendants contained denials of the material allegations in the bill on which the right to the relief prayed for were founded. The defendant Stearns Coal & Lumber Company, by cross-bill, sought a personal decree against the plaintiffs for the amount of the notes purchased by it. A decree was entered dismissing plaintiffs' bill and granting the relief prayed for in the cross-bill, of which plaintiffs seek review by appeal.

Plaintiffs insist that there was "a failure of consideration as to the notes in suit;" that there was "fraud and/or mutual mistake in the joint cruise as to the actual amount of feetage," and that plaintiffs are not bound thereby; that defendant Culver was guilty of fraud in misrepresenting the nature of the timber, and that the Stearns Coal & Lumber Company is not a holder in due course of the notes.

It is seldom that two cruisers, although both have experience in such work, will agree upon the stumpage of a particular description of wooded land, and yet it is a well-known fact that men engaged in the lumber business have bought and sold many millions of feet of timber upon the estimates of cruisers. There is no other way in which the amount thereof can be determined before it is cut. The accuracy of the estimates is dependent upon the competency of the cruiser, upon the care with which he does his work, and upon his integrity. Mr. Sheridan, who acted for the Consolidated company, had had about 40 years' experience in such work, largely in the upper peninsula of this State, where these lands were situate. His competency cannot be questioned. The cruisers who worked with him were not called as witnesses. He testified that he carefully examined the timber on all the descriptions and made what he believed to be an accurate estimate thereof. The only thing in any way affecting his integrity is the fact that other cruisers, employed by the plaintiff company, found much less timber on the lands than he did. To accept their estimates we must find that Sheridan intentionally made an unfair estimate, and that the cruisers appointed by plaintiff who accompanied him, and who were charged with the same duty that he was, either carelessly, or with knowledge of his intent to overestimate, agreed with him in the results reached by them.

The estimate by Banzhaf & Watson was made by two of its employees under the personal supervision of Mr. Watson. The cross-examination of these parties as witnesses discloses no reason why their estimate should not be accepted as correct. It was, however, made in the months of March and April, when snow and water were upon the lands. Other

estimates were made for the defendants by Sheridan and William Quinn. Sheridan found 13,624,000 feet on the land, and testified that some timber had been burnt after his first estimate. Quinn had had 38 years' experience as a cruiser. His estimate was 12,851,000 feet. If we add to these the amount of the timber theretofore removed, conceded by plaintiffs to be 3,162,077 feet, we have the total timber, as estimated by Sheridan, to be 16,786,077 feet and by Quinn 16,013,077 feet. The difference between these amounts and the original estimate may be accounted for by the fire and the fact that no two estimates, even though made by the same person, are likely to reach the same result. No reason is disclosed why we should accept the estimate of the employees of Banzhaf & Watson rather than that of Quinn, and yet they found but about one-half of the timber on the land that he did. Other facts may be considered in their bearing upon the accuracy of these estimates. Mr. Parr, who had been in the lumber business in Michigan for about 40 years, testified on cross-examination: that the condition of the lumber market in 1919 was "pretty good—good prices and good demand;" that when prices are good and the demand is good a lower grade of lumber passes on the market than when prices are the opposite; and that if he was logging and prices were high "an operator would log closer;" that the slump in the price of lumber occurred in the fall of 1920; that on October 6th "we were having boys running in with telegrams, canceling everything," and that "the prices continued to go down until about 1925."

That the timber had less value when estimated for the plaintiff company than when purchased by it is conceded. This fact may have unconsciously influenced the action of the cruisers as timber, mer-

chantable when the price is high, may not be so considered when it is of little value.

On March 9, 1925, the plaintiff company sent to the Consolidated company the six notes here involved, amounting to $40,000, as renewals of those held by it, accompanied by a letter written by Mr. Parr in which no reference was made to any shortage in the estimate of this timber. This letter was written in the month following the disclosure of Tuttle that the timber on the land was not virgin timber; that but "scattering trees" were left on one of the sections, and that "there was no use of putting a railroad in because there was not enough stuff to warrant doing so."

It also appears that these notes, specifically described as "Notes Receivable, Brown Lumber Co. * * * $40,000," were included in the advertisement of the sale of the assets of the Consolidated Lumber Company, published in the Manistique Pioneer Tribune of December 10, 1925, to be had on January 20, 1926. This paper was published in the city of Manistique, in which plaintiff company's plant was located. No protest was made on the day of sale that the plaintiff company had not received value therefor. The Stearns company later purchased them, paying either 97½ or 98½ cents for each dollar of the face value thereof.

The burden was upon the plaintiffs to establish the fact that there was fraud or such a mistake in the joint cruise made by Richmond and Sheridan as relieves it from compliance with the terms of the contract entered into pursuant thereto.

After due consideration of the facts disclosed in this record, we cannot so find. "Courts do not make contracts for parties." *Lee State Bank* v. *McElheny,* 227 Mich. 322, 327. The conclusion reached

finds support in *Nester* v. *Michigan Land & Iron Co.,* 69 Mich. 290; *Malone* v. *Gates,* 87 Mich. 332; *Gadell* v. *Iron, Land & Lumber Co.,* 226 Mich. 482, and *Grymes* v. *Sanders,* 93 U. S. 55.

Having so found, it is unnecessary to decide whether or not the Stearns Coal & Lumber Company was a holder of the notes in due course.

It is claimed that the defendant Culver practiced fraud upon the plaintiffs in that "he misrepresented the timber sold to plaintiffs by statements to the effect that it was 'virgin hardwood timber.' " There is testimony tending to support this claim. Culver denied making any such statements. His denial finds much support in the fact that the report of Richmond and Sheridan contained many annotations of "cut," "cut off," "old cutting," and "old cedar cut," and after its receipt Parr wrote the Consolidated company that the report was "final" and "settlement will be made accordingly," and settlement was so made by the contract of June 1st.

The decree is affirmed, with costs to appellees.

Butzel, C. J., and Wiest, Clark, McDonald, Potter, and North, JJ., concurred. Fead, J., did not sit.